I wonder if the appellate defender and the state's attorney would step up and identify yourselves for the record. Good morning. My name is Linda Olthoff and I represent Peter Lawrence. Good morning. Good morning, Your Honor. My name is Bill Taffanetti. Thank you both. Have you argued here before? Yes. You have. So you'll each be allowed 15 minutes to address the court and open argument. A matter of personal disclosure, counsel, with respect to your worthy opponent, Mr. Taffanetti. Mr. Taffanetti was an assistant state's attorney out in the 3rd Municipal District in my courtroom for several years. And I abused him regularly on a daily basis. But I want you to know that I have never favored him one way or the other. I just continue to abuse him now at the appellate level as well. All right. Okay. You may proceed. Thank you. Is this an issue of law in this case or is it an issue of fact? Both. Depending on the same fact. Are you creating an issue of law as to what makes credibility or lack of it definitive as a matter of law? Is that the issue of law? No. Okay.  Yes. I will tell you. And I will lay forth the facts. And I believe that the facts as they are set forth in the record and what can be inferred from those facts support the application of law. Am I doing damage to the sequential logic of your argument by interposing this question now? If so, I'll wait for the answer. You can simply start on your presentation. Okay. That is fine. I will be happy to answer. Yes. Well, and frankly, I can jump right into what I think are the facts established by this record, which call for a clear application of the law in this case. We're arguing that McCulley applies in this case because Pierre Lawrence was in custody. His attorney was there to come and see him, talk to him, and the police denied access to him. Well, you're urging the McCulley case to be applied in two alternative scenarios, one where Farrell did not advise the defendant of the presence of Vukovic, the other that it applies even if he did advise. And that's kind of interesting, where you're urging that even though McCulley conditions its ruling on the denial of access to a failure to inform, puts it in a more positive sense, that when the attorney appears, physically appears at the station, one should not, one cannot be dismissive of his presence without either allowing him access or advising the defendant that he's there and giving the choice to the defendant. Your second contention is that even if the defendant is advised and chooses not to see him, that access still must be permitted on a mandatory basis because the client, his client or the defendant cannot effectively make that choice without, or should not be caused, put in the position of making the choice to deny counsel, or to negate his right to see the attorney without the attorney being there to counsel him. How serious is that second argument? The second argument, I believe, has a very solid basis in McCulley. But it's not McCulley. It's not McCulley because McCulley still says either you advise him or you give him access. If you advise him and imply, if you advise him and he turns it down, access is no longer mandatory. I think it would be helpful if I first go through the timeline of that particular afternoon, which, yeah, let me go through that timeline because we may not need to reach that point. The attorney arrived, we know that the attorney arrived at the station at 4.30. We also know that at 5 or 5.30, about 5 o'clock, the ASA and the detective began interviewing Peter Lawrence. Around 5 or 5.30, Lieutenant Farrell goes back to the attorney and said, it's going to be a little longer. Lieutenant Farrell does not, the conversation with the ASA lasts about 45 minutes, they say, before they get that statement memorialized. Not until 6 o'clock does Lieutenant Farrell go back and tell the attorney he doesn't want to see you. There's really, I think, two reasonable conclusions that can be inferred from that timeline. One is that Lieutenant Farrell never told Peter Lawrence that an attorney was there because the ASA was in the room, Sergeant Keene was in the room, neither of them heard or were aware of this attorney's presence downstairs. Even if we accept that Lieutenant Farrell did tell the attorney, or did tell Peter that the attorney was there, it didn't happen, based on the facts of this record, until 6 o'clock, which is after this conversation occurs with the ASA and Sergeant Keene. But that was not Farrell's testimony, was it? His testimony was fairly ambiguous. I went back and talked to her and told her that Peter doesn't want to see you. The testimony of Attorney Vukovic was that it was not until 6 o'clock that he came back. But there was testimony by Farrell. I want to put this thing in perspective. I'm not here espousing the notion that since the policeman testified that his credibility has to be left entirely to the trial court. Far from it. But I want to see where the center of gravity of this issue is, as far as you're concerned. Because I don't think you cited any cases to us that disputes or asserts that as a matter of law, the credibility of the policeman, even under what could be considered superior circumstances, should be denied in favor of the testimony of the defendant and more plausible circumstances that seem to militate the other way. Because the question still is whether it is so manifestly unreasonable that as a matter of law, there should be no credibility to Farrell. The only case you cite that comes close to that is the Clay case. And I know a little bit about the Clay case because I co-signed, it was a judgment penalty, with me on the panel. And in that particular case, the trial court made the initial credibility determination and chose not to believe the policeman because the defendant had bruises. Here we have testimony of Attorney Vukovic who says he didn't come back until 6 o'clock. That is not refuted by evidence from the State. Remember, the burden is on the State to prove by preponderance of the evidence that this confession was voluntary. Now, to answer more directly your question as to what if we accept, you know, give credibility, and Farrell went back and told. Isn't it our call to make once the trial court has decided, based on the very facts that you argue, to believe Farrell? It's not where the trial court says, we don't care. It didn't make an error of law with regard to the right of the defendant to be given access to his attorney when the attorney is on the premises. To me, it's a credibility issue. Okay. If you choose to defer, and I think even in light of the timeline, but if you do choose to defer and say, okay, Lieutenant Farrell came and talked to Peter Lawrence, and Peter said, I don't want to see you. We still have a problem under McCulley. McCulley talks about communication to the client and access. And the underpinnings of McCulley are really concerned with the attorney-client relationship. And it talks about how, in Illinois, we really favor, policy in Illinois favors that a client has access to his attorney during an interrogation. There's language in McCulley that interfering, for the police to interfere with that attorney-client relationship, is one of the very fundamental. Can I interrupt you for one moment? Now, at this point, when this attorney arrives, there was, am I incorrect, but there had been another attorney there earlier? Yes. One or two? There were a couple attorneys from the same agency, First Defense Legal Aid, that came to see him. Okay. So there were two. Right. But one of them was there for Nicky Stroud. Right. Yes. No. Was it for the other co-defendant? This is the victim we're talking about now. Right. One was there for the victim? No. Okay. That's who Stroud is, isn't it? Correct. Different murder. There were two cases. Yes. Two cases. Two statements. So one was in court. Okay. One was for each one. Regarding the other case. There were attorneys there. For each case. Correct. He had been in custody for over 48 hours at this point. He had given a statement on a separate case. But at that 5 o'clock hour with the assistant state's attorney and Sergeant Keene, the state's attorney was aware that attorneys had been there earlier. The attorneys from 24 hours before. She knew that, yes. She was not aware that there was an attorney there at that moment. Okay. But what did she say later about that? At trial, she clearly said, I did not know that there was an attorney right at that time. Okay. All right. But she had advised him when she spoke to him that she was aware that an attorney had been there representing him, and did he want to speak to her in light of that? Correct. Okay. Now, this other lawyer is from a different he's not from that agency. He had, they're lawyers from the same agency, from First Defense Legal Aid. Okay. All right. All right. I see. Okay. Right. All right. Go on then. I'm sorry. I just wanted to get that straight. Sure. So, yeah, I guess to finish or to go back to your concern, you know, McCauley speaks to a client-attorney relationship, and the big problem that arises is the police interfere with that. So here you have a police officer or detective injecting himself into the attorney-client relationship. And the attorney and the client are relying on a detective, whose interests are clearly adverse to the client, to relay the information to each other. And McCauley talks about how certainly, you know, the attorney is there. So the presumption should be for us, if we were to follow your view of McCauley, that under the totality of the circumstances, a police officer's sworn testimony as to what he said to a lawyer is not credible in this context. And what he heard from the defendant is not credible. No. I think that there's a lot more information that can go. I mean, why not have... There's a lot of speculation that could surround this particular case, and you've got the speculation throughout your brief as to what might have happened. But the testimony of all of those involved would seem to indicate that the trial judge was not speculating. He was relying on what he heard. We ultimately, of course, because it becomes a question of law as to whether his confession was voluntary, we have to take all of the circumstances into consideration. Not only the stuff with the lawyers, but the statements that the defendant admitted having made with respect to his attitude toward the crime itself. The fact that he made a statement, and I assume... Not the inculpatory statement. The statement's about wanting to get it off his chest. Exactly. Now, there is this possibility that the defendant... First of all, it seems like if you go with what the judge kind of concluded, the defendant didn't want to be... The tenor of this was the defendant didn't want to be the one person stuck with this murder all by himself. He was there with multiple people, and he didn't want to be the guy, the fall guy, the traditional fall guy for this murder. He wanted some blame to be shifted to others. That's not an unreasonable theory. And there is also this possibility that occasionally defendants are overcome with guilt, and they actually do want to confess. So, I mean, I think that that's kind of part of the picture that the judge was looking at, and he did make certain factual determinations. And then the defendant testified about being beaten, and he also testified about not getting his asthma medicine. But he also testified he was smoking. And I don't know whether that's the point being that there were certain factual conclusions that the court came to based on everything it heard. So is it possible, if you accept that, that the defendant wanted to get it off his chest, and that he didn't want to be left holding the bag for the whole murder, you know, for the murder himself, rather, and he figured his lawyers weren't going to be able to do anything at this point when he was overcome with some guilt. It does happen that people want to confess. It does happen. So, if we accept those kinds of, you know, facts, where does McAuley come in and say, stop? McAuley says that if you have an attorney at the station and you are being interrogated, you have a right to have that attorney there, regardless of whether he wants to get it off his chest. And we don't know. He can still get it off his chest if the attorney is there. The attorney is so vulnerable. McAuley doesn't take away his option, though. The defendant's option as to whether he wants to see that attorney. If you, in fact, accept the truth of the statement that he advised, that Farrell advised the defendant, but that the defendant chose not to see his lawyer, that option still remains with McAuley. Perhaps it shouldn't, but it does. Is that possible from this factual record that didn't the lieutenant say that he advised him there was an attorney there and he said, I don't want to talk to him right now? That's what the lieutenant testified to. But we also have the testimony that is unrebutted. Well, when you say unrebutted, I'm not sure I understand. If the lieutenant is saying that the attorney was there, I told, you know, Lawrence, Peter Lawrence, about the presence of the attorney. He said, I don't want to talk to the guy right now. I'm not sure I'm saying – I don't understand how you say, well, then her – his – Vukovich's testimony later is unrebutted. His testimony is, they didn't come out and tell me this until 6 o'clock. How is that unrebutted if the lieutenant is – Well, the lieutenant didn't say, well, I was – because he didn't – it's relevant because if he didn't come out until 6 o'clock, the barn door has been opened, the statement has been given. It is the state's burden to show that we have protected the defendant's rights in this case. Yes. There's nothing to say, no, I talked to the defendant before he talked to the ASA. There's nothing to refute her timeline of events. And if, in fact, then her timeline of events is true, McCauley most certainly applies because it was not communicated until it was too late. That's right. Okay, but I thought Farrell did have a timeframe. He didn't? Not that I'm aware of. Did he say that he talked to the defendant before the defendant gave his statement? I think he did. I think that's – at least if he didn't say that specifically, in context, it's clear that what he said was that the defendant refused to see his lawyer and then gave his statement. I mean, I guess I would have to, like, check back to the record. But, yes, perhaps that is the spirit of his testimony. Well, why would he have to go beyond that? And why would he want to necessarily go immediately back to the attorney when he's hot on the trail of getting the confession? You know, he's going to stay there and not interrupt until he gets what he wants from Lawrence. Well, that's the problem right here. But, you see, those things are measured out by the United States Supreme Court and our Supreme Court very carefully. Because there is the – globally, this represents a question of the Sixth Amendment right of the defendant and balance against the reasonableness of police investigation. And how do you make – give deference to the right of the defendant to have his Escobedo rights to counsel without hamstringing the police in their investigation in getting a defendant whom they believe to be culpable to talk? And that doesn't always work out smoothly because there are various psychological dynamics that can control a defendant's mind that – for which one could say, even though at the moment he may choose to go with the police because of this kind of concern or that kind of concern, generally in the area of police kind of pressure, whether actual or simply existing in the air, in the very air one breathes in a precinct house. But for whatever reason it is, we're going to let the police do their precinct work as long as they don't directly challenge the right to counsel. It's a measured out kind of allocation or compromise of really conflicting policies. So we can't simply take the one position without giving credence to the other, insofar as the courts have already worked it out. McCauley addresses this as an issue of state due process law. We are not hamstringing the police when there is a lawyer at the station at 4.30 ready to see that client. And in fact – Well, does the police – the question is, to what extent does the attorney's initiative – you know, I once had a case involving the attorney not being physically present but calling on the telephone. And that's a different case. Yeah, right, right. Now, when the attorney is actually on the premises, there seems to be a surge in the right of the defendant to see him of some sort. But to what extent should that right be greater than simply knowing that this defendant is represented? The next thing you'll say is don't take any confession without making sure that the attorney is there. Just as we would say, for example, with the array, the identification array, you know, where we say that's a critical element in the case and there should be a right to counsel. You know, you can say that. But in essence – This is what we spoke here. I mean, this is – McCauley says you have a lawyer at the station.  You have a right to that lawyer. Well, you have a right to a lawyer when there's a lineup. You need the right to a lawyer, right? It's a critical element in the case. There can be – no one says you have a right to a lawyer's presence when you're making a confession unless you want that right. That's what the Miranda warning is about, to request, to solicit. Do you want it or don't you? And we're not going to delve in to the psychodynamics of the defendant's answer. If he in fact says, no, I don't want, the police at that point say, fine, we'll charge ahead. Get the confession before he changes his mind. You know, it's not a perfect world in that sense where you can accommodate fully to the psychodynamic of the defendant and yet not hamstring the police in their investigative efforts. McCauley says the policies of Illinois favor having a defendant have counsel available at the time of interrogation. They favor that and they prohibit interference with that right to counsel. And I think also, you know, Woods is another case that is instructive here because in that case, the lawyer was denied access. The lawyer left a detailed note and a business card. The police subsequently told the defendant, you know, your lawyer is here. We will make arrangements for you to come and talk to him or for him to come talk to you. The defendant said, no, thanks. I'm okay to talk. This court said, that's not enough because we're not only worried about relaying general information. This is about specific information that bears directly on your right to counsel. And to rely on the police as an intermediary and to interject himself into that attorney-client relationship is just not what McCauley stands for. I think we understand your position. Okay. We're going to give you an opportunity to respond at any length you wish after we've heard from the state's attorney on the case. Okay? Thank you. Thank you. Good morning, Your Honors. My name is Bill Taffanetti. I'm an assistant state's attorney. Counsel, good morning. Why shouldn't we just conclude and presume that with a man who's been in custody for 55-and-a-half hours in hotel lockup, that the police probably overbore his will to resist? Is there any evidence in here at all that he was ever given a bed or any place to sleep for the 55-and-a-half hours? Yes, there is. He was taken down to the lockup numerous times when he was allowed to sleep. He was allowed to sleep in the lockup? Yes. With his handcuff to the wall? He was not handcuffed to the wall in the lockup. And the testimony for when he was up in the interview room was that he was not handcuffed. But there is testimony in the record that there was periods of interruption where he was taken down to the lockup cell. Yes. But he testified that he was chained to the wall all night and received a boot in the stomach from a lapel from Lopez. Clearly, the judge, who was the chiropractor, did not believe that. Otherwise, this would be a state appeal rather than a defendant's appeal. Was the day before the other murder, or did that follow this Nikita? I'm sorry, Your Honor? The victim. The day before. How long had he been there when Vukovic showed up? The first time Vukovic showed up was on November 22nd, about noon. He had been brought in about 24 hours earlier. Proceda May came to the police station that evening. So he had the advice of counsel within hours of his having come in. Dawn Sheik came in later on that same day on the 21st. She claimed she was not allowed access. Vukovic came in on the 22nd, was allowed access. So he met with counsel on two separate occasions. But he met with Vukovic after the statement. Isn't that right? He met with Vukovic after the first statement. After the first statement on this case? No. The first statement is about the other case. Of a different case. Okay. What attorney claimed that – was Vukovic who claimed that she was denied access? She claimed that – This was an officer of the court who testified under oath that she was denied access by the police. Are we talking about Dawn Sheik's? No, I'm talking about Vukovic. Is that a female or a male then? We've got some confusion here. I'm sorry? Is Vukovic, this attorney, a male or a female? Female. Okay. She testified that she was there at 430 on November 23rd, that Farrell came out, and that she was not allowed to see him with Farrell telling her that the defendant didn't want to see her. That's correct. And that's what the judge accepted as true. The judge stated in his findings there was a reasonable explanation why the second attorney wasn't allowed to speak to Mr. Lawrence, and that was on his own request. So that's the finding of fact, the determination of credibility. Was this the first time she was there? Pardon? Was this the first time Vukovic was there? The second. Okay. So when had she been there, the day before? She was there on the 22nd and the 23rd. Okay. She was denied access on the 23rd. That's what she says. She was allowed to talk to her client on the 23rd. Wouldn't it be a better policy for the policeman confronted with this kind of a situation to say, counsel, he doesn't want to talk to you, but you probably would want to hear it from his own mouth, so I'll take you down to see him? What's wrong with that? It's not a constitutional question. And the question of what's wrong with that is not a legal standard, okay? The legal standard here is whether or not the defendant had been advised by counsel, was advised that counsel was available to talk to him, decided he no longer wanted to follow the advice of counsel and did not want to confront him. The problem with that is, aside from the conceptual notion that Justice Cato is pointing to, why not make sure that if he's at the station he gets access? But the problem is the credibility issue. It's not as if the police or any law enforcement agent is going to testify like the Pope or like the Dalai Lama, or you can just bet your life on it, you know? The reputation is quite to the contrary because the investigatory agency has a stake in getting that confession. So there's immediately a conflict of interest in that witness who then testifies, sure, I told him and he didn't want it. Wouldn't that also militate very close scrutiny to the entire context? If you're going to deny that access under these circumstances, to make darn sure that there is an established, plausible basis to believe that testimony, instead of just leaving it up in the air, this is a credibility call and for us to back away from it. It is a credibility call. But I would point, Your Honor, to Justice Bolandic's partial concurrence in dissent in McCauley, in which he talks about the difference between what is ethical and what is constitutionally mandated. This may have been a wrong call ethically or honorably or just in terms of prudence. You're talking about the police officer's decision. By the police officer not allowing counsel to go back to hear it from her own client. But it's not a constitutional question. Well, maybe it could be, though. Defendant's defense counsel. If you're talking about an analysis based on the totality of the circumstances, wouldn't the time he's been in custody be one of the considerations that we take? I mean, couldn't there be a presumption? Well, if you haven't gotten a confession on him under the first 48 hours, maybe the presumption is that he's under duress. Defendant is not raising in any way, shape, or form his appeal based upon that aspect or even any other kind of duress. So what you're basically attacking is the brief of the State Appellate Defender for not raising the issue precisely. Is that a barrier to our analysis of the constitutional question? I think it is appropriate for counsel to determine what the proper issues are. And I'd be happy to defend her in an ineffective counsel claim on post-conviction. Let's look at the totality of defendant's behavior. Defendant who had twice met with counsel and who had the advice of counsel immediately began to reestablish contact with the police because he wanted to know what was going on. He wanted to know what the caliber of the weapons were. He wanted the police to know that he didn't mean to kill anybody innocent, that he wasn't the true bad guy out there. This is a defendant who wanted to talk to get his story out. And this comes through throughout the three days of his being in custody. This was a handwritten statement prepared, though, by the police officer, not by... I thought it was the state's attorney. State's attorney drafted it. He said it was too embarrassed or too ashamed to videotape. That's what the testimony said. That's what he said, yes. Okay. But look at what he signs off on in that statement. Oh, I know. He waves everything but the flag. Well, he says P.J. never told the detectives that he wanted to stop talking. P.J. didn't agree with the lawyer because he feels terrible about what happened and said he would be like an asshole to keep it all to himself. P.J. told detectives he wanted to keep talking so they would understand that Meng Meng was the real bad guy out there. P.J. states some lady lawyer came to see him a few times. He talked to her alone. He signed off on all of this. She told him not to say anything. And then he added in his own handwriting, he said, I know I'm going to be charged with murder, but I wasn't aiming at innocent people. I'm asking mercy on my behalf. This is the defendant. What about the, did you say, is there a map or a diagram attached to this? It's not attached to the record. No, to the statement. Is there a diagram or no? That was the other murder? Your Honor, I honestly, I don't know. What was the reference to the diagram? I think he did do a diagram for this case. It was not attached to the record that I received in preparation for this argument. So I cannot reference it. What we've got here, then, is a defendant who is calibrating his own self-interest. He has received the advice of counsel, and he has determined that in his best interest to reject it and to talk to the police. Whether that's the smart thing to do or not is not before this Court. That's his decision. And as for the McCauley question, McCauley requires that he be informed that his lawyer is present for him to speak with, and we complied with that. He was informed that the lawyer was there. That's the finding of the judge, and there is nothing credible in this record to call that into question as a matter of law. Well, the question is whether that credibility call should be viewed with closer scrutiny than credibility calls in other contexts, particularly when the attorney is sitting there, the defendant is in his cell and chooses to confess. The policeman knows that the confession is close because contextually and chronologically the confession comes during that period of time when the attorney is there so that the policeman knows I'm close to getting it out of him. Now if I tell him that the attorney is there, it's going to disrupt him, and God knows if he's ever going to want to talk again. And, of course, he tells the story, and I'm not necessarily raising that in context. He tells the story of brutality and coercion that made the difference in tipping the scale. But let's put that aside. Let's not consider that since the trial judge didn't consider it. What's inherent in the circumstance is that this declination of his attorney's access came at the moment where he was confessing. Eno? Is there a question in there, Your Honor? Yes. Should we simply accept the standard credibility call position and say it's for the trial judge, or should we really look into it? As a matter of law, this Court is not a fact finder. All right. I am not aware of any Illinois case that assigns levels of scrutiny. No, but they do assign levels of standard of review, and that's always troubled me. Maybe you can help me out. McCauley sets it out. Most of the cases set it out. One of them is we defer to the trial judge on all findings involving factual issues and credibility of witnesses. Unless they're manifestly erroneous. I'm sorry? Unless they're manifestly erroneous. The ultimate decision as to whether or not the confession is voluntary is a de novo review. Now, how do we get to the de novo review without asking the kinds of questions that Judge Gordon was posing to you that you couldn't find the question in? And let me add a little fact to this, you know, that the defendant has strongly urged in the brief. The fact is that the State's Attorney Coleman and her cohort testified in court that they were not aware that Vukovic was sitting in the precinct house during the period of the confession. And all your response says is that they were aware of previous, they were aware that Vukovic was present at some time. So there is no direct refutation of that fact. And it's really implausible for the State's Attorney not to know that a fellow professional was there during the time she was taking the confession. Unless the lieutenant didn't tell her. Yeah, unless the lieutenant didn't tell her. Is that a fair presumption? I say it's a fair presumption. That the officer failed to inform the State's Attorney that there was a lawyer waiting patiently outside to see the defendant. And is that plausible? It's very plausible. But, again, I don't think it matters. So you're going to lay it all on the police department rather than on the State's Attorney's office? I don't see any problem with the State's Attorney's testimony. She made sure that the defendant knew he had. No, I'm not saying there's any problem with it at all. But she did say that she made a damaging admission to your position. She said, I didn't know there was a lawyer out there. I don't see how that damages my position. I don't. I truly don't. So long as the defendant knows he has a lawyer, I don't think it's important for the State's Attorney. To be fully informed by the police as to what's going on. Is it plausible to assume that in that particular social context, there would be no cross-communication between the policeman and the State's Attorney as to the presence of defendant's attorney? What if you had a wily police officer with 30 years of experience of interrogating murder suspects and an assistant State's Attorney on felony review? And we know where a lot of State's Attorneys start out, don't they? They start out on felony review. A State's Attorney who's only been in the office maybe a year. I wouldn't make that presumption. You wouldn't? Okay. No, I wouldn't make that one either. All right. What about the gun? When was the friend, the girlfriend, sent out to fetch the gun? After the statement was taken. After the statement. Okay. Anything else for Mr. Taffanetti? Well, we promised you abuse, Mr. Taffanetti. Always a good time. You've got to say, always a good time. No, I mean, there's a difference between abuse and close interrogation to your position. Incidentally, for both of you, I should say this right now. The briefs that you prepared were able briefs, and the lawyering in this case has met all of our expectations. Counsel, you get the last word. Ms. Althoff, right? Correct. Yeah, I'd just like to touch on two points that this Court addressed. The fact that they did not, that Lieutenant Barrell never told the State's Attorney that an attorney was there. It seems to me that the State's Attorney is there to ensure that a confession is legally taken, that things are done above board. Why would you not ensure that that State's Attorney can ensure that there is a waiver, a proper waiver of that attorney who's sitting downstairs? And, in fact, if you look at Peoples v. Woods, where, again, the detective had a note from the attorney, and the Court ultimately held failure to withhold that note from the defendant violated McCauley. But further, the detective threw away that note, did not show it to the other police, and did not show it to the State's Attorney. And this Court held the fact that that detective never showed a defendant or the ASA the note that he left showed that his actions were deceitful. And the other point I would like to make is that the role of the police officer, why are we injecting the police officer into the client-attorney relationship at all? When an attorney shows up, why is it up to the police to go ask, do you want to see him? Bring the attorney to him and let the attorney determine that for himself. My opponent seems to concede that perhaps this was unethical or untoward in some way. Well, McCauley is concerned with State due process. And State due process essentially requires fairness, integrity, and honor in the operation of the criminal justice system and in the treatment of its citizens, cardinal, constitutional protections. Finally, to a point that Justice Gordon made earlier, we are not impeding police investigation by ensuring that an attorney has access to his client. Because, again, as McCauley holds, no system worth preserving should be afraid. What you're saying is that if it's not impeded, it's the fault of the defense counsel. Because what you're saying is when a defense counsel shows up at the precinct, you don't have to ask the defendant whether he wants them or not. You have to bring them there. And that's virtually, I don't know, I haven't done the statistics, but I'm imagining that that's going to squelch quite a large percentage of the confessions that the police obtain. And it's not something you have to do when the attorney is at his office, even if his office is a half a block away. It may or may not squelch confessions. We don't know. But, again, just to quote McCauley, which is actually quoting Escobedo, no system worth preserving should have to fear that if an accused is permitted to consult with a lawyer, he will become aware of and exercise his rights. And I guess with that, I would just like to close and ask that this Court, based on McCauley, reverse and remand this case for further consideration. Thank you. Counsels, thank you both. The case was well-argued and well-briefed, and it will be taken under review.